**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **EVA COSTA, as Personal Representative** ) | |
| **for the Estate of EUGENE M. COSTA,** ) | |
| **deceased,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 11-0297-WS-N** |
| ) | |
| **SAM'S EAST, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

**ORDER**

This matter comes before the Court on defendant's Motion for Judgment as a Matter of
Law or in the Alternative, Motion for New Trial or in the Alternative, Motion for Remittitur
(doc. 109). The Motion is ripe for disposition.

**I.      Relevant Background.**

Plaintiff Eugene M. Costa brought a single negligence claim against defendant Sam's
East, Inc., after sustaining injuries in a Sam's Club retail store when a Sam's employee
inadvertently caused a large boxed flat-screen television to topple from a shelf and strike Costa's
left leg. Costa suffered a hematoma on his leg and, according to his treating physician, a long-
term deterioration in his overall health as a result of this injury. Two years later, during the
pendency of this litigation, Costa died. Thereafter, Costa's widow, Eva Costa, was substituted as
the named plaintiff, in her capacity as personal representative of Costa's estate, pursuant to Rule
25(a), Fed.R.Civ.P. Ms. Costa did not alter the claims or legal theory against Sam's; rather, she
continued to pursue a state-law claim of negligence against Sam's for her late husband's personal
injuries. The case was tried before a jury on September 18 and 19, 2012.

In the weeks preceding trial, the undersigned entered three Orders (docs. 85, 86, 87)
resolving the parties' key evidentiary and conceptual disagreements concerning the manner in
which trial would be conducted. The first Order (doc. 85), entered on August 6, 2012,
adjudicated (among other things) whether plaintiff could present evidence at trial that Costa's

death was caused by, the result of, or was contributed to by the Sam's accident.  The August 6 Order concluded that "Plaintiff may not present evidence or argument at trial that Costa's leg injury caused or was a contributing factor in his death."  (Doc. 85, at 5.)  In an important limitation to this ruling, however, the August 6 Order also provided as follows:  "[P]laintiff may put on evidence of Costa's deteriorating physical condition, pain and suffering, and so on (provided that she shows a causal connection between those circumstances and his injury at Sam's) from the moment of the accident until the moment of his death."  (*Id.* at 4.)

The second Order (doc. 86), entered on August 8, 2012, resolved Sam's numerous objections to the designated deposition testimony of Costa's treating physician, Dr. Michael O'Dowd.  In relevant part, the August 8 Order implemented the principles set forth in the August 6 Order, to-wit: (i) that plaintiff would not be allowed to introduce opinions from Dr. O'Dowd that the Sam's accident caused or contributed to Costa's death, but (ii) that plaintiff would be allowed to introduce opinions from Dr. O'Dowd concerning Costa's deteriorating health condition from the date of the accident until the date of Costa's death, provided that a causal connection between the accident and Costa's health condition were shown.  In practical terms, what this meant was that the August 8 Order authorized plaintiff to introduce testimony from Dr. O'Dowd that the Sam's accident made Costa sicker and caused his health to decline, but forbade plaintiff from presenting any opinions from Dr. O'Dowd that the Sam's accident caused or contributed to his death.[1]

The third Order (doc. 87), entered on August 9, 2012, examined in great detail the parties' competing arguments concerning whether the case should be tried as an ordinary negligence case (as plaintiff had consistently requested since the inception of the litigation) or whether it was properly tried as a premises liability case (as defendant favored).  After briefing and careful review of pertinent authorities, the undersigned concluded that "Alabama courts decide whether the appropriate framework for analyzing duty is traditional negligence or

---

[1]        Two excerpts from the August 8 Order illustrate the point.  In one passage, the Court overruled certain objections posited by Sam's, reasoning that "[t]he witness offered no opinions that the Sam's accident caused or was a contributing factor in Costa's death in this excerpt.  Instead, he testified as to Costa's health condition following the accident but before his death, and opined that he died of heart failure."  (Doc. 86, at 2.)  In another passage, the Court overruled other objections interposed by Sam's, explaining that "[t]his testimony does not relate to causes of death, but instead the quality of Costa's life and health following the accident."  (*Id.*)

premises liability by reference to whether the injury was caused by the landowner's affirmative conduct or by a condition of the premises." (Doc. 87, at 4.)  The August 9 Order explained that Costa's position had always been clear that plaintiff sought recovery not on the theory that Sam's premises were dangerous (*i.e.*, because televisions were stacked in an unsafe manner), but on the theory that Sam's was liable in *respondeat superior* because its employee negligently knocked a television over, causing it to fall on Costa.  Because plaintiff's theory "cannot reasonably be framed as one for injury caused by a condition of the premises," the August 9 Order reasoned, "under the clear Alabama precedent set forth above, general negligence principles govern this lawsuit." (*Id.* at 5-6.)  Thus, the August 9 Order concluded, "[t]his action will not be tried as a premises liability case, but will rather be presented to the jury in the traditional negligence framework that plaintiff has touted from the outset of the proceedings." (*Id.* at 6.)

All of these rulings were handed down well over a month before trial, thereby affording the parties abundant opportunity to refine their trial presentations in recognition of same or (if appropriate) to request reconsideration or clarification of particular aspects of the Orders. Defendant took no action on any of these August pretrial rulings, and certainly did not suggest at any time before trial that they were internally contradictory or manifestly erroneous under Rule 60, Fed.R.Civ.P.  Accordingly, the August 6, 8 and 9 Orders governed the trial, and the parties' evidentiary presentations, closing arguments, and jury instructions were subject to the unambiguous parameters imposed by those rulings.

At the close of all the evidence at trial, after receiving detailed instructions on the law from this Court and retiring to deliberate, the jury returned the following verdict:  "We the jury find for the Plaintiff and award damages in the amount of $200,000.00." (Doc. 102, Exh. 1.)[2] On the jury's unanimous verdict, the Court entered Final Judgment (doc. 103) on September 21, 2012, in favor of plaintiff and against Sam's in the amount of $200,000.

---

[2]     The amount of this verdict was substantially lower than plaintiff's requested damages award of $742,000 (calculated at $1,000 per day for pain, suffering, mental anguish and loss of quality of life for each of the 742 days from the date of the Sam's accident until the date of Costa's death), but substantially higher than the $24,000 figure (calculated at $1,000 per month for each of the 24 remaining months of Costa's life after the injury) floated by defense counsel as a fair and reasonable amount in the event that the jury found liability.

Now, within the time frame authorized by Rule 50(b), Fed.R.Civ.P., defendant files its Motion for Judgment as a Matter of Law, with alternative Motions for New Trial and for Remittitur embedded therein.  Remarkably (given that the trial turned on narrowly circumscribed evidentiary and legal issues, and lasted barely a day before the jury received the case), defendant enumerates some 54 assignments of error that it contends entitle Sam's to post-trial relief.[3] Fortunately, defendant's supporting memorandum groups these items into six discrete categories for discussion purposes, to-wit: (i) Alabama premises liability law governs this case; (ii) defendant was entitled to judgment as a matter of law even under a traditional negligence analysis; (iii) defendant was prejudiced by the admission of evidence concerning Sam's corporate conduct; (iv) Dr. O'Dowd's testimony about death and hospitalizations was unfairly prejudicial to Sam's and contrary to the Court's orders; (v) Dr. O'Dowd's billing testimony should not have been admitted; and (vi) Sam's is entitled to remittitur.  The Court will take the same approach in its analysis herein.[4]

## II.    Governing Legal Standards.

Although defendant's Motion is cast in several alternatives, the bulk of its briefing focuses on its request for new trial under Rule 59, Fed.R.Civ.P.  District courts are empowered to grant a new trial in a civil case "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Rule 59(a)(1)(A), Fed.R.Civ.P.  That said, the remedy of a new trial is "sparingly used."  *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 375 (1st Cir. 2004); *see also Dean v. Specialized Sec. Response*, --- F. Supp.2d ----, 2012 WL 2450821, *2 (W.D. Pa. June 27, 2012) ("Requests for a new trial are disfavored by the law.").  "Motions

---

[3]     Given the gratuitous (not to mention overlapping and repetitive) volume of grounds for relief enumerated in the Motion, the Court cannot help but wonder whether defendant was channeling its inner Paul Simon (circa his 1976 chart-topping single, "50 Ways to Leave Your Lover") in compiling this list.

[4]     The Court notes that a number of defendant's 54 assignments of error enumerated in its Motion do not fit within these six categories and are not addressed in defendant's memorandum.  If defendant did not think enough about certain of the listed grounds for new trial or judgment as a matter of law to develop them in its brief, then the undersigned does not think enough of them to unilaterally formulate defendant's possible arguments and legal analysis from scratch.  Certainly, it is not the Court's responsibility to guess what defendant might mean by certain items casually enumerated in a 54-item list, much less to fill in the evidentiary foundation and legal mortar for same when movant failed to do so.

for new trial must establish a clear and obvious error of law or fact." *Evans v. Washington Metropolitan Area Transit Authority*, 816 F. Supp.2d 27, 31 (D.D.C. 2011) (citation omitted). "A trial court should not grant a new trial merely because the losing party could probably present a better case on another trial." *Hannover Ins. Co. v. Dolly Trans Freight, Inc.*, 2007 WL 170788, *2 (M.D. Fla. Jan. 18, 2007). As a general matter, "[t]he court may order a new trial if it is required to prevent injustice or to correct a verdict that was contrary to the weight of the evidence." *Dean*, 2012 WL 2450821, at *2.

Here, Sam's requests for new trial are based in large part on the undersigned's discretionary rulings at trial.[5] "Because it is critical that a judge does not merely substitute his judgment for that of the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (internal quotation omitted); *see also St. Luke's Cataract and Laser Institute, P.A. v. Sanderson*, 573 F.3d 1186, 1200 n.16 (11th Cir. 2009) (similar). Indeed, the Eleventh Circuit has stated that, as to evidentiary issues, "a new trial is warranted only where the error has caused substantial prejudice to the affected party (or, stated somewhat differently, affected the party's 'substantial rights' or resulted in 'substantial injustice')." *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004) (citations omitted). The guiding principle is that "[a] new trial will not be granted based on trial error unless … the court concludes that manifest injustice will result from letting the verdict stand." *Learmonth v. Sears, Roebuck and Co.*, 631 F.3d 724, 731 (5th Cir. 2011) (citation omitted).[6]

---

[5]     In defendant's own words, "much of the error Sam's believes was committed during the trial was the result of the Court's adverse discretionary rulings." (Doc. 109-1, at 2.)

[6]     *See also Dean*, 2012 WL 2450821, at *2 ("A trial court will not grant a new trial on the basis of trial error unless the error resulted in prejudice."); *Wallace v. Poulos*, 861 F. Supp.2d 587, 599 (D. Md. 2012) (motion for new trial should be granted "only when it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done") (citation and internal quotation marks omitted); *Jennings v. Thompson*, 813 F. Supp.2d 29, 32 (D.D.C. 2011) ("Generally, a new trial may only be granted when a manifest error of law or fact is presented. Further, the standard for granting a new trial is not whether minor evidentiary errors were made.") (citation omitted).

Insofar as Sam's is renewing its motion for judgment as a matter of law under Rule 50, the proper legal standard is as follows: "[A] court should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. … We review all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party." *Gowski v. Peake*, 682 F.3d 1299, 1310 (11th Cir. 2012) (citations omitted). "[I]f there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied." *Id.* at 1311 (citing *Christopher v. Florida*, 449 F.3d 1360, 1364 (11th Cir. 2006)). Simply put, "judgment as a matter of law is appropriate only if the facts and inferences point so overwhelmingly in favor of one party that reasonable people could not arrive at a contrary verdict." *Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010) (citation and internal marks omitted).

Finally, to the extent that Sam's is requesting remittitur, "a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence." *Goldstein v. Manhattan Industries, Inc.*, 758 F.2d 1435, 1448 (11th Cir. 1985); *see also Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33, 44 (1st Cir. 2011) ("Remittitur is called for where an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.") (citations and internal quotation marks omitted). The touchstone of the remittitur inquiry is "whether the jury's award is within the range dictated by the evidence," viewing such evidence in the light most favorable to the non-movant. *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1266 (11th Cir. 2008).

**III.    Analysis.**

      **A.    *Use of Traditional Negligence Principles, rather than Premises Liability.***

            *1.    Defendant's Attempt to Relitigate the August 9 Order.*

As an initial matter, defendant insists that it is entitled to judgment as a matter of law or a new trial because this Court's "failure to apply the appropriate premises liability law in this case constitute[s] reversible error." (Doc. 109-1, at 5.) It is defendant's position that this case should have been governed by Alabama premises liability law, not by traditional negligence principles. Of course, this Court has already examined this issue in great detail prior to trial. *See Costa v. Sam's East, Inc.*, 2012 WL 3288680 (S.D. Ala. Aug. 9, 2012). Not only does Sam's Motion

largely ignore the August 9 Order, it devotes some six pages to repeating and rehashing arguments that were specifically considered and rejected in that August 9 Order.  What's more, defendant has not even attempted to rebut the specific reasoning of that Order, much less to explain with particularity why it thinks the Court should reconsider the carefully considered and explained conclusions in that Order.  Why defendant pursued this quixotic Motion in this fashion (rather than simply appealing the ruling, as is its right) is a mystery.

In the context of defendant's Rule 50/Rule 59 Motion, no constructive purpose would be served by the Court reiterating the reasoning and conclusions of the August 9 Order in detail.  Nor would a wholesale cutting and pasting of that Order here be helpful to anyone.  Summary disposition of this issue is warranted.  *See generally New Hampshire Ins. Co. v. Blue Water Off Shore, LLC*, 2009 WL 2230827, *1 (S.D. Ala. July 20, 2009) (summarily rejecting ground for new trial on legal issue that had already been briefed and ruled on before trial, where movant "offers no good reason for reconsidering that ruling"); *ArcelorMittal France v. AK Steel Corp.*, 811 F. Supp.2d 960, 972 (D. Del. 2011) (in motion for new trial context, "[b]ecause plaintiffs present no new evidence or arguments as to why the court erred in its claim construction or its order that barred plaintiffs from asserting literal infringement, the court will not address these allegations").

Nonetheless, the Court does pause to correct several misstatements of law articulated in defendant's Motion.  First, Sam's begins with the premise that "[i]n Alabama, an injured visitor's status remains the pertinent inquiry when determining whether premises liability concepts apply to claims asserted against a landowner."  (Doc. 109-1, at 5.)  This is wrong.  For more than two decades, courts applying Alabama law (including the very decisions on which Sam's relies) have consistently explained that, regardless of the injured visitor's status, traditional negligence principles govern when the injury was caused by the landowner's affirmative conduct, rather than by the condition of the premises.  *See Lilya v. Greater Gulf State Fair, Inc.*, 855 So.2d 1049, 1053 (Ala. 2003) (where plaintiff was invitee, and parties disputed whether invitor's duty "should be extracted from general principles of negligence or of premises liability," reasoning that "[t]he key to this question is whether the injury was caused by some affirmative conduct of the landowner or by a condition of the premises"); *Baldwin v. Gartman*, 604 So.2d 347, 349 (Ala. 1992) (where plaintiff was invitee injured by falling slab, opining that if the landowner had "bumped the slab and caused it to fall, his conduct, distinct from his status

as landowner, could then be said to have caused the injury and could be evaluated by an ordinary negligence standard," notwithstanding plaintiff's status as invitee);[7] *Orr by and through Orr v. Turney*, 535 So.2d 150, 152 (Ala. 1988) ("This special classification privilege is not generally regarded as applicable, however, when it is the affirmative conduct of the landowner, rather than the condition of his premises, that causes the injury.  In this context, the justifications for determining liability based upon the classification of the injured party … do not attach."); *Powell v. Piggly Wiggly Alabama Distributing Co.*, 60 So.3d 921, 925-26 (Ala.Civ.App. 2010) (where parties argued over whether case was governed by premises liability or traditional negligence, holding that premises owner's "duty comes from traditional negligence principles" because "it was the alleged negligent actions of Tubbs in operating the forklift that ultimately caused Powell's injury, rather than any dangerous condition existing within the warehouse").

Second, defendant's suggestion that this Court's ruling that traditional negligence principles apply when an injured plaintiff seeks recovery for injury caused by the landowner's affirmative conduct "could throw the law of premises liability into turmoil" (doc. 109-1, at 6) is misguided.  As shown above and the August 9 Order, Alabama courts have been distinguishing between injuries caused by a landowner's affirmative conduct and those caused by a condition of the premises for many years.  No chaos, turmoil, or dire consequences for shopkeepers or appellate courts have ensued; to the contrary, decisions such as *Lilya* and *Powell* reveal that these principles are well-settled and uncontroversial in Alabama jurisprudence today.

Third, any contention by defendant that the Court should shrug off the very clear statements by the Alabama courts in *Lilya*, *Baldwin*, *Orr* and *Powell* as *dicta* rather than holdings is unpersuasive.  Nowhere do *Erie* principles restrict federal courts sitting in diversity to look solely to state-court <u>holdings</u> in determining applicable law.  To the contrary, federal courts routinely look to and follow state appellate courts' unambiguous pronouncements about an issue, whether presented as holding or *dicta*.  *See, e.g., LeFrere v. Quezada*, 582 F.3d 1260, 1267 (11th Cir. 2009) ("Although *dicta* is not binding, it can provide federal courts with insight into a state court's thinking."); *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d

---

[7]    In its brief, defendant's assertion that "*Baldwin* involved licensee plaintiffs" (doc. 109-1, at 9) is demonstrably erroneous.  *See Baldwin*, 604 So.2d at 350 ("Baldwin's status is that of an invitee").  Defendant's confusion on this point underscores how unimportant the plaintiff's status is in these cases.

1317, 1326 n.5 (11th Cir. 2005) ("a federal court attempting to forecast state law must consider whatever might lend it insight, including relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand") (citation and internal quotation marks omitted); *First Financial Bank v. CS Assets, LLC*, 2011 WL 2936663, *2 n.2 (11th Cir. July 22, 2011) ("We recognize that the clear expressions of the Alabama Supreme Court … were not holdings of those cases.  Nonetheless, … [t]he Alabama Supreme Court has spoken clearly and unequivocally on this issue.  For us, these pronouncements provide sufficient and significant guidance on how the Alabama Supreme Court would rule if presented with this issue.").

Fourth, defendant suggests that the August 9 Order amounts to an unreasonable, irresponsible "*Erie* guess" about an issue that "Alabama has not spoken to."  (Doc. 109-1, at 11.)  The Court disagrees.  As explained in the August 9 Order and summarized above, Alabama appellate courts have on several occasions since the late 1980s been squarely confronted with the question of whether an injured plaintiff's claims against a landowner are governed by traditional negligence or premises liability standards.  In each of those cases (regardless of the injured plaintiff's classification), the Alabama courts have announced that the analysis is driven by whether the injury was caused by the landowner's affirmative conduct (in which case traditional negligence law applies) or by a condition of the premises (in which case premises liability law applies).  Although defendant makes much of this case arising in the invitor/invitee context, so did *Lilya*.  So did *Baldwin*.  In each of those decisions, the Alabama Supreme Court applied the affirmative conduct / condition of the premises distinction to determine which law governed.  Alabama courts have spoken loudly and clearly on this issue.  Defendant's dissatisfaction with those courts' message is not a viable ground for judgment as a matter of law or for new trial.

> 2.  *Defendant's Contention that this Case Morphed into a Premises Liability Action at Trial.*

Going into trial, everyone understood that this case would be governed by traditional negligence principles, and not by premises liability law.  The August 9 Order was as clear as the day is long on this point.[8]  On the morning that the trial commenced, the Court reiterated the

---

[8]      *See Costa*, 2012 WL 3288680, at *4 ("This action will not be tried as a premises liability case, but will rather be presented to the jury in the traditional negligence framework that plaintiff has touted from the outset of the proceedings.").

point, as follows: "This action will not be tried as a premises liability case but will, rather, be presented to the jury in the traditional negligence framework.  Those are the contours of this case, and I expect the parties to abide by that."  (Doc. 107, at 7.)[9]

For whatever reason, the parties did not abide by that unambiguous admonition at trial. In the afternoon session on the first day of trial, plaintiff's counsel inexplicably asked the Sam's employee (Christopher Middleton) and the Sam's manager (Bobby Browning) a series of questions about the condition of the premises, involving matters such as Sam's policies for the proper stacking of merchandise and whether the televisions were stacked properly on the day in question.  (Doc. 107, at 164-70, 173-76, 182-85.)[10]  Plaintiff's counsel also asked Browning a series of questions about whether he had surreptitiously made copies of Ms. Costa's private papers immediately after the accident.  (Doc. 107, at 186-93.)  All of this testimony was plainly objectionable on relevance grounds given the Court's pretrial rulings.  Yet defense counsel sat mute, never objecting to these lines of questioning as being outside the clear parameters of the trial as designated by the Pretrial Order, the August 9 Order, and the contours of the case as announced by the Court that morning.

Rather than objecting contemporaneously during the trial, Sam's now endeavors to parlay plaintiff's mystifying, short-lived premises liability detour into post-trial relief, arguing that "Plaintiff undoubtedly converted this case to a premises liability matter."  (Doc. 109-1, at 14.) He did not.  Whatever plaintiff's counsel's thinking may have been, in response to direct, pointed questioning by the Court at the end of the first day of trial, he was emphatic that he still intended to try the case solely as one for simple negligence.  In particular, the Court asked, "So, what is this case?  Is it simple negligence or is it a premises liability case or it both or what – I mean,

---

[9]      Defendant acknowledges that it fully understood as much, going into the trial. (Doc. 109-1, at 23 ("The Court made it clear from the outset that this case was to be governed by and tried as a traditional negligence case.  That is what Sam's prepared for and that is what counsel argued in their respective opening statements.").)

[10]      An example of the types of questions that plaintiff's counsel asked is as follows: "It would have been safer to stack the boxes with some kind of a wire or something across the front of them to keep them from tipping out just in case an accident like this to occur, wouldn't it?"  (Doc. 107, at 184.)  Such queries unambiguously went to the presence or absence of a hazardous condition on Sam's premises, which was not a triable issue herein.

what are we dealing with here?"  (Doc. 107, at 201.)  Plaintiff's counsel answered, "Well, it's just a simple negligence case."  (*Id.*)

  Having thus confirmed that plaintiff's counsel was not seeking to convert this case into a premises liability matter, the Court was left with the question of how to keep the trial on track as a traditional negligence case, consistent with plaintiff's stated intentions from the inception of this matter, as well as the Pretrial Order, the August 9 Order, the parties' opening statements, and plaintiff's counsel's statement at the close of all the evidence that he still viewed the case as solely one for traditional negligence, not premises liability.  Of course, district courts are vested with broad discretion in how to manage the trials over which they preside.[11]  In this case, the Court announced to the parties on the morning of the second day of trial that "I am confident that this case is not about premises liability, notwithstanding the questions that were asked of the two witnesses at the end of the trial yesterday.  It's still not a premises liability case.  It's a straight negligence case.  That's what it's been from the beginning, and I think that's what it is now." (Doc. 108, at 206.)  To allay any possible confusion to the jury on this score, and in the absence of any constructive proposals for remedial measures by either side, the Court exercised its inherent authority to manage the trial by crafting an appropriate curative instruction.  That instruction was included in the final jury charge to direct jurors that they could not base defendant's liability on whether there was a hazardous condition in the store, or whether the premises were safe or unsafe.  (Doc. 108, at 253.)  The Court thus ensured that the issue of premises liability remained off the table, as it had properly been since the start of the trial.  No one objected to the wording or inclusion of this curative instruction.  Both sides presented their

---

[11]   *See, e.g., Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1315 (11th Cir. 2005) ("District courts have broad authority over the management of trials."); *United States v. Colomb*, 419 F.3d 292, 300 (5th Cir. 2005) ("The scope of the district court's discretion to manage trials before it is and must be particularly broad. … [D]istrict courts have wide-ranging control over management of their dockets, the courtroom procedures, and the admission of evidence.") (citation omitted); *see generally Equity Lifestyle Properties, Inc. v. Florida Mowing and Landscape Service, Inc.*, 556 F.3d 1232, 1240 (11th Cir. 2009) ("A district court has inherent authority to manage its own docket so as to achieve the orderly and expeditious disposition of cases.") (citation and internal quotation marks omitted).

closing arguments based solely and exclusively on a traditional negligence framework.[12]  The jury was instructed solely and exclusively on traditional negligence principles.

The point is simple:  This sequence of events negates Sam's characterization that plaintiff's counsel's unobjected-to questioning of two witnesses concerning merchandise stacking somehow instantaneously and irrevocably "converted this case to a premises liability matter."  (Doc. 109-1, at 14.)  It did no such thing.  Rather, the case was tried, argued, presented to, and decided by the jury as a traditional negligence action.  Because the case was prepared, tried and submitted to the jury solely on traditional negligence grounds, defendant's argument that it is entitled to judgment as a matter of law or a new trial because a few errant (and unobjected-to) questions by plaintiff's counsel converted the trial into a premises liability case is counterfactual and unfounded.  Also, because this case was properly tried and adjudicated as a traditional negligence case, whether the evidence could have supported Sam's liability under premises liability law had the action been tried as a premises liability case is a pointless inquiry founded on a false premise, and cannot form a cognizable basis for post-judgment relief under Rule 50 or Rule 59.

   **B.     Lack of Proof of Negligence.**

Next, Sam's asserts that it is entitled to judgment as a matter of law, even under a traditional negligence framework, because plaintiff presented no evidence of negligence.  According to Sam's, "[t]here was no testimony that what Mr. Middleton did was unreasonable or that it was foreseeable and probable (not merely possible) that injury would result" from his actions.  (Doc. 109-1, at 19.)

_____

[12]     For example, plaintiff's counsel's argument to the jury was that they should hold Sam's liable because "the evidence is clear that Mr. Middleton knocked the box over. … Was Chris Middleton the one who knocked the box?  Did the box hit Mr. Costa's leg?  Did it cause him the injury?  I'm not going to tell you what you have to do, but I'm asking you for the result that, yes, they were responsible for that act."  (Doc. 108, at 219.)  Defendant's counsel argued the case the same way, telling the jury in his closing argument that "[t]here has been no testimony criticizing what Mr. Middleton did. … Instead, each witness has told you and has agreed, we're sorry, it's just an unfortunate accident."  (Doc. 108, at 233.)  Defense counsel specifically emphasized the point in its closing argument that it was not a premises liability case, arguing as follows: "But listen to the judge because he's going to instruct you, he's going to tell you that the condition of the premises is not for you to even consider in this case, that that has nothing to do with this matter."  (Doc. 108, at 231.)

Defendant's Rule 50 Motion based on lack of proof of negligence faces extraordinarily difficult legal obstacles, which defendant neither acknowledges nor overcomes.  It is black-letter law that "[t]he determination of negligence is ordinarily one for the trier of fact because of the necessity that the trier of fact assess the reasonableness of defendant's conduct under all the circumstances. … The party seeking to have an issue of negligence withdrawn from the jury in federal court bears a heavy burden."  *Smith v. Tennessee Valley Authority*, 699 F.2d 1043, 1045 (11th Cir. 1983); *see also Decker v. Gibson Products Co. of Albany, Inc.*, 679 F.2d 212, 216 (11th Cir. 1982) ("the determination of negligence is ordinarily within the province of the trier of fact because of the peculiarly elusive nature of negligence and the necessity that the trier of fact assess the reasonableness of the conduct under all the circumstances").  The legal test is particularly daunting under Alabama law; indeed, the Alabama Supreme Court has opined that "only when one would have to infer from no evidence at all that the defendant breached its duty can a court take the question from the jury and enter a judgment as a matter of law for the defendant."  *Glass v. Birmingham Southern R. Co.*, 905 So.2d 789, 795 (Ala. 2004) (clarifying that, where a duty of care is owed, a jury issue on negligence is presented unless there is "a complete absence of evidence indicating a breach of [defendant]'s duty"); *Barnett v. Norfolk Southern Ry. Co.*, 671 So.2d 718, 720 (Ala.Civ.App. 1995) ("Even where the evidence does not conflict, the question whether a person has exercised due care is still normally a question of fact for the jury to determine.") (citation omitted).

Was there a "complete absence of evidence" that Middleton (Sam's employee) failed to use reasonable care to prevent harm to others on this occasion?  Absolutely not.  This is not a close question.  The jury heard testimony from Ms. Costa, who was an eyewitness, that Middleton's body knocked the television over onto Costa as Middleton was emerging from under a shelf where he had plugged in a television.  (Doc. 107, at 51.)  The jury watched video of the accident that showed the same thing.  Ms. Costa indicated that Middleton never cautioned them that "he was about to go underneath the shelving and that that might be something that would be dangerous to [her] or Mr. Costa."  (*Id.* at 83.)  The jury heard Costa's testimony in his video deposition that Middleton "tried to push the box. … Apparently, when he went to push it, it didn't slide.  It stuck and tipped.  Because the next thing I know is the TV is – the TV on the bottom shelf, this big box, is falling over and it hits me in the side of my leg."  (*Id.* at 142.)  The jury heard Middleton testify that, in trying to plug in Costa's television, he moved another

television to the edge of a shelf, even though Costa was standing nearby; and that as Middleton emerged from the shelving, that "there's a possibility I could have backed into the TV to knock it over." (*Id.* at 170-72.) Middleton testified, "I'm assuming I probably backed into the TV coming out. … As far as I know, that is probably the most legitimate reason it did fall." (*Id.* at 172.) Middleton also said that when he knocked the television over, Costa was standing only "a couple feet back … in the vicinity to where I was at." (*Id.* at 173.)[13] The jury heard Browning (Sam's manager) testify that Middleton would have had to strike the television with significant force (*i.e.*, harder than a "bump test") in order to knock it over. (*Id.* at 183-84.)

This testimony, considered in the aggregate along with all the other evidence at trial, plainly raises a reasonable inference of negligence by Middleton in the course and scope of his employment that may properly be attributed to Sam's (his employer) via *respondeat superior*. While defendant's Rule 50 Motion criticizes plaintiff's counsel for presenting a circumstantial case, no principle of law or procedure obligated plaintiff to prove negligence via direct evidence (*i.e.*, "testimony that what Mr. Middleton did was unreasonable" (doc. 109-1, at 19)). A reasonable jury could have looked at this evidence, and concluded that Middleton failed to use reasonable care to prevent harm to Costa when he (i) moved a large boxed television to a precarious position at the edge of shelf, and in his way as he reached into the shelving; (ii) positioned his body next to that television as he worked under shelving to plug in another television; (iii) failed to warn Costa (who was standing nearby) to back away; (iv) extricated himself from the shelving in a careless or unsafe manner; and (v) knocked his body into the box with sufficient force (*i.e.*, harder than a bump test) to cause it topple over onto the customer.

Under the circumstances, and given this evidence, the Court will not invade the province of the jury and enter judgment in defendant's favor as a matter of law when there was obviously evidence from which a reasonable jury could conclude that Sam's was negligent. *See generally Smith v. District of Columbia*, 413 F.3d 86, 97 (D.C. Cir. 2005) ("Intrusion upon the rightful province of the jury is highly disfavored. We have repeatedly emphasized that the jury's verdict must stand unless the evidence, together with all inferences that can reasonably be drawn

---

[13] Given plaintiff's counsel's extensive questioning of Middleton at trial about his specific acts and omissions in causing the television to fall over, defendant's contention that "[t]he entirety of Plaintiff's examination of Mr. Middleton … related to how Sam's displays is merchandise" (doc. 109-1, at 20) mischaracterizes the evidence.

therefrom is so one-sided that reasonable people could not disagree on the verdict.") (citations and internal marks omitted).  The Motion for Judgment as a Matter of Law on this point is groundless.

###### C.        Admission of Evidence of Sam's Corporate Conduct.

Defendant also seeks a new trial on the ground that plaintiff injected "confusion" into the trial by eliciting testimony from the two Sam's witnesses about the condition of the premises, how merchandise was stacked, and so on.  According to defendant, "[t]his confusion necessitates a new trial." (Doc. 109-1, at 25.)  In particular, defendant reasons that the "confusion" about how the testimony concerning Sam's merchandise stacking policies and procedures meshed with plaintiff's traditional negligence theory of liability meant that the jury "had to conclude" that Sam's was liable for failing to stack and secure its merchandise properly.  (*Id.*)  This argument for a new trial under Rule 59 is fatally flawed in at least four respects.

First, while the Court agrees that plaintiff's counsel's questioning of Middleton and Browning about irrelevant matters bore a potential for confusing the jury, defendant's conduct was instrumental in creating that confusion.  As plaintiff's counsel was asking questions about stacking policies and bump tests and other ways merchandise could have been secured, defense counsel sat idly by, not objecting.[14]  Defendant now says it should not be faulted for not objecting because "Sam's has always maintained … that the case should be governed by Alabama premises law.  There was no obligation on the part of Sam's counsel to object when Plaintiff's counsel proved him right."  (Doc. 109-1, at 14 n.6.)  By all appearances, then, defendant made a strategic decision <u>not</u> to object to the testimony that it now protests was so confusing and prejudicial, because it hoped to use such testimony to transform this case into the premises liability lawsuit it had always wanted.  The direct consequence of defendant's opportunistic behavior was that this "confusing" testimony was heard by the jury, causing defendant what it now calls "unfair prejudice."

---

[14]        As the Court noted in addressing defendant's ensuing motion for mistrial based on the "confusion" caused by plaintiff's counsel's injection of premises liability concepts into his questioning of witnesses, "first of all, it may have been helpful if the Defendant had objected at the time that information was elicited from the witness.  We did not get a contemporaneous objection.  I would have been more than pleased to sustain it and to give a curative instruction at that time.  That didn't happen, so we are where we are today."  (Doc. 108, at 211.)

In short, defendant had the power and opportunity to prevent this "confusion" and "prejudice" from ever surfacing, simply by lodging a contemporaneous objection.  Having elected not to do so in hopes of promoting defendant's own strategic agenda of shape-shifting this litigation into something that it never was and never had been, defendant cannot now be heard to complain about being "unfairly prejudiced" by this "confusing" evidence simply because that roll of the dice did not pan out as defendant had hoped.  *See generally Wilson v. Attaway*, 757 F.2d 1227, 1242 (11th Cir. 1985) ("objections to the admission of evidence … are preserved only if they are timely and state the specific ground of objection, if the specific ground was not apparent from the context") (citations and internal quotations omitted); *Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 427 (6th Cir. 2004) ("In the absence of a timely objection, such testimony [which may have been inadmissible] is generally not considered to be erroneously admitted."); *BFS Retail & Commercial Operations, LLC v. Harrelson*, 701 F. Supp.2d 1369, 1377 (S.D. Ga. 2009) ("Generally, when a party does not object to the admission of certain evidence at trial, that party waives his right to complain about such admissions later."); Rule 103(a)(1), Fed.R.Evid. (a party preserves a claim of error in the admission of evidence "only if the error affects a substantial right of the party and … a party, on the record … timely objects or moves to strike").[15]

Second, defendant is not entitled to a new trial on the basis of "confusion" resulting from the testimony concerning condition of the premises because the Court took adequate and appropriate steps to alleviate the confusion.  In particular, the Court spelled out plaintiff's theory of liability for the jury, instructing them that "the disputed issues of fact to be decided by you in

---

[15]     In a nutshell, then, defendant's conduct consisted of (i) declining to object when plaintiff's counsel elicited obviously irrelevant testimony concerning premises liability concepts despite the Court's clear pretrial rulings excluding a premises liability theory; (ii) using that testimony as a springboard to attempt to transform the case into a premises liability trial, as defendant had always wanted it to be; and (iii) when that maneuver failed, complaining that the resulting admission of such testimony was so unfairly prejudicial to defendant that a mistrial or new trial is necessary.  This course of conduct veers perilously close to invited error, if not actually qualifying as same.  *See generally Pensacola Motor Sales Inc. v. Eastern Shore Toyota, LLC*, 684 F.3d 1211, 1231 (11th Cir. 2012) ("A party that invites an error cannot complain when its invitation is accepted."); *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1213 (11th Cir. 2011) ("The invited error doctrine stands for the common sense proposition that someone who invites a court down the primrose path to error should not be heard to complain that the court accepted its invitation and went down that path.").

this case are whether the Defendant was negligent in knocking over a television box onto Eugene Costa." (Doc. 108, at 252.)  The jury was also instructed that "Plaintiff's negligence claim rests on her contention that Mr. Costa was harmed by the negligence of the Defendant's employee, Chris Middleton." (*Id.* at 253.)  To confirm the point, the Court *sua sponte* formulated and gave the following curative instruction at the end of the trial:  "[Y]ou are instructed that you cannot find the Defendant liable based on a hazardous condition in the store.  Whether the premises were safe or not is none of your concern." (*Id.* at 253.)  Curative instructions are an effective, efficient and oft-used tool for erasing any taint caused by testimony or argument that a jury should not have heard.  Jurors are presumed to follow such instructions.[16]  Not only was this curative instruction given, but defense counsel expressly highlighted it to the jury in his closing argument.  (Doc. 108, at 231.)  More generally, neither side in its closing argument said anything about stacking policies, hazardous conditions, or the manner in which televisions were or should have been stacked or displayed by Sam's.  This evidence simply was not mentioned by either side.  Through this omission, coupled with the Court's clear directive to the jury "that you cannot find the Defendant liable based on a hazardous condition in the store" and could not base their verdict on "[w]hether the premises were safe or not," any confusion injected into the record by plaintiff's counsel's unobjected-to premises-liability questioning of Middleton and Browning was effectively neutralized.  These circumstances simply do not give rise to the sort of "substantial prejudice" or "manifest injustice" of the kind needed to support a motion for new trial under Rule 59.

Third, this ground for new trial is improper insofar as it is predicated on defendant's dissatisfaction with the Court's curative instruction.  In support of its Rule 59 Motion, Sam's attacks the instruction as lacking "context," failing to specify "to what evidence or law the Court was referring," and being so "confusing and non-specific" that it "could not have had the desired

---

[16]    *See United States v. Newsome*, 475 F.3d 1221, 1227 (11th Cir. 2007) ("[W]hen a district court gives a curative instruction, the reviewing court will reverse only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition.") (citation omitted); *see also United States v. Almanzar*, 634 F.3d 1214, 1223 (11th Cir. 2011) ("The district court instructed the jury to disregard Agent Jones's remark, and we presume the jury complied with that instruction."); *United States v. Perez*, 30 F.3d 1407, 1411 (11th Cir. 1994) ("When a court gives a direct and explicit curative instruction regarding improper testimony, it supports the court's decision not to grant a mistrial by decreasing the possibility of undue prejudice.").

result." (Doc. 109-1, at 25.) This argument is not cognizable on a motion for new trial because defense counsel waived it. The time to object to the proposed curative instruction was at trial, not a month after the fact in a post-trial motion. The Court circulated a proposed jury charge and held a charge conference for the specific purpose of allowing the parties to object and otherwise to be heard on particular aspects of the instructions. If defense counsel felt that the proposed curative instruction was "confusing and non-specific," or wanted it to be expanded to delve into the particulars of the evidence and legal theories that the jury was not to consider, counsel could and should have spoken up at that time. Instead, when asked at the charge conference if they had any objections or other matters to take up with regard to the jury charge, defense counsel responded, "Judge, we're okay with everything that you've given us, but just for the record, we would like to preserve a position that it is still a premises liability case." (Doc. 108, at 212.) Defense counsel said <u>nothing</u> about alleged deficiencies in the curative instruction, and made no request that it be revised or expanded to address the concerns now articulated in their Rule 59 Motion.

By saying they were "okay with everything that you've given us," counsel agreed to that charge; therefore, review of it has been waived under the doctrine of invited error. *See United States v. Dortch*, --- F.3d ----, 2012 WL 4335185, *6 (11th Cir. Sept. 11, 2012) ("[W]hen a party agrees with a court's proposed instructions, the doctrine of invited error applies, meaning that review is waived even if plain error would result.") (citation omitted). Even setting aside that doctrine, it is a basic principle of trial procedure that failure to object to jury instructions constitutes a waiver except "in narrow circumstances when an error is so fundamental as to result in a miscarriage of justice or when the district court's instruction amounts to plain error." *Heath v. Suzuki Motor Corp.*, 126 F.3d 1391, 1394 (11th Cir. 1997) (citation omitted); *see also S.E.C. v. Diversified Corporate Consulting Group*, 378 F.3d 1219, 1226-27 (11th Cir. 2004) (where losing party argued on appeal that district court's curative instruction was insufficient to cure error caused by female juror's improper comment, appeals court refused to consider it because "if he thought the court's curative instruction was inadequate, he had a duty to speak up" at the time, but did not do so); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1329 (11th Cir. 1999) ("We interpret Rule 51 strictly, and require a party to object to a jury instruction or jury verdict form *prior* to jury deliberations in order to preserve the issue on appeal."); *In re Daikin Miami Overseas, Inc.*, 868 F.2d 1201, 1206 (11th Cir. 1989) ("If a party has an objection, the party must

make the objection.  Failure to interpose an objection in a timely manner means the party forgoes raising the issue.").[17]  Had Sam's proposed modifications to the curative charge at the charge conference, the Court certainly would have considered them.  Sam's did not.  Having told the Court that it was "okay" with the proposed curative instruction at that time, Sam's cannot and will not be heard to complain now that it deserves a new trial because that curative instruction was "confusing and non-specific," or should have provided more or different guidance to the jury.  Such Monday-morning quarterbacking has no place in a Rule 59 request.[18]

---

[17]     *See generally Givens v. O'Quinn*, 447 F.Supp.2d 593, 601 (W.D. Va. 2006) ("[A] motion for a new trial cannot be based on alleged errors in the instructions or verdict form when no corresponding objections were raised at trial."); *Cipriani v. Lycoming County Housing Authority*, 177 F. Supp.2d 303, 310 (M.D. Pa. 2001) ("A party moving for a new trial on the basis of an improper jury instruction must have made an appropriate and timely objection prior to the start of jury deliberations.") (citations omitted); Rule 51, Fed.R.Civ.P. (reciting proper procedure for preserving objections to jury instructions).

[18]     If Sam's intends to hang its hat on a "plain error" theory for the curative instruction, such a contention is doomed on its face.  With respect to jury instructions, trial courts are afforded "wide discretion as to the style and wording employed." *Gowski v. Peake*, 682 F.3d 1299, 1310 (11th Cir. 2010) (citation and internal quotation marks omitted).  In this Court's view, the curative instruction given was firmly within this "wide discretion" and was sufficient to apprise the jury that premises liability was out of the case and that they could not hold Sam's liable on the theory that the store was unreasonably dangerous or the stacked boxes constituted a hazardous condition.  (This is particularly true, given the other instructions telling the jury that the disputed issue of fact was whether Sam's had been negligent in knocking the television onto Costa and that plaintiff's negligence claim rested on whether Costa had been harmed by Middleton's negligence.)  The Court intentionally avoided including more detail about which testimony or legal theory these instructions related to, so as to avoid calling unnecessary attention to that testimony or theory.  In the Court's experience, belaboring a point such as this may have the unintended consequence of actually causing the jury to focus on that which they are supposed to be disregarding.  This judgment call was well within the Court's discretion, and in no way prejudiced or compromised defendant's substantial rights.  Certainly, no purported defect in that instruction could come even close to satisfying the Eleventh Circuit's stringent test for jury instruction errors on plain error review. *See, e.g., Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1018 (11th Cir. 2004) ("Plain error review is very stringent and reversal for incorrect jury instructions will occur only in exceptional cases when the error is so fundamental that it results in a miscarriage of justice.... To meet this standard, the party must prove that the instruction was a misstatement of law that likely led to an incorrect verdict," and that the instruction "mislead[s] the jury or leave[s] the jury to speculate as to an essential point of law.") (citation omitted); *Farley*, 197 F.3d at 1330 (to be cognizable on plain error review, the challenged jury instruction "must be so prejudicial as to have affected the outcome of the proceedings") (citations and internal quotation marks omitted).  In any event, the Court is (Continued)

Fourth, defendant's argument about confusion and undue prejudice also fails insofar as Sam's insists that "the jury should have been instructed on premises liability" after plaintiff's counsel extracted unobjected-to testimony from Sam's employees concerning merchandise stacking policies and so on.  This argument is redundant of that presented in Section III.A., *supra*, and is rejected for the same reasons set forth therein.

For all of these reasons, individually and collectively, Sam's is not entitled to a new trial based on the purported "confusion" interjected into the trial when plaintiff's counsel pursued a premises-liability type line of questioning of two witnesses while defense counsel said nothing.

### D.      Dr. O'Dowd's Testimony Concerning Costa's Death.

As its fourth category of grounds for new trial, defendant contends that "Dr. O'Dowd's Testimony was Unfairly Prejudicial and Confusing, Warranting a New Trial" (doc. 109-1, at 25.) Dr. O'Dowd, Costa's longtime cardiologist and treating physician, testified by video deposition at trial.  (Doc. 107, at 87-112.)  There was substantial pretrial motion practice concerning the scope and extent of Dr. O'Dowd's video deposition that would be played to the jury, with the Court entering orders bearing on that issue on both August 6, 2012 and August 8, 2012.  (*See* docs. 85, 86.)  Defendant now seeks to re-litigate those pretrial admissibility determinations, as well as to pursue a new argument for the first time.

#### 1.      Purported Contradiction of Court's Earlier Orders.

The premise of this ground for new trial is defendant's contention that Dr. O'Dowd was allowed to testify about the causes of Costa's death "[i]n contradiction of the Court's Order" (doc. 109-1, at 2), and was erroneously allowed "to express an opinion the Court held to be both irrelevant and prejudicial."  (*Id.* at 3.)  By Sam's reckoning, the testimony the Court admitted concerning the causal relationship between the Sam's accident and Costa's health deterioration "is the very testimony that Sam's sought to exclude; it is the very testimony the Court ruled could not be introduced, yet it was."  (*Id.* at 26.)

Defendant's argument either misunderstands or mischaracterizes the underlying rulings. Contrary to defendant's Rule 59 position, this Court <u>never</u> found that the jury could not hear that

---

confident that no manifest injustice resulted from the challenged curative instruction, as would be necessary for Sam's to be entitled to a new trial on that basis.

Costa was deceased or that the Sam's injury caused his health to decline in the two years before his death.  The August 6 Order explained as follows: (i) "plaintiff brought no wrongful death claim and is barred as a matter of Alabama law from recovering for [Costa's] death on her personal injury claim" (doc. 85, at 3); (ii) under Alabama law, "plaintiff may put on evidence of Costa's deteriorating physical condition, pain and suffering, and so on (provided that she shows a causal connection between those circumstances and his injury at Sam's) from the moment of the accident until the moment of his death" (*id.* at 4); but (iii) "Plaintiff may not present evidence or argument at trial that Costa's leg injury caused or was a contributing factor in his death" (*id.* at 5).[19]  The admissibility of this portion of Dr. O'Dowd's testimony was thus evaluated by two principles.  First, to the extent that he testified to medical opinions that the Sam's accident caused a deterioration in Costa's physical condition, pain and suffering and the like up until the moment of his death, such evidence was properly admissible as proof of damages in this personal injury lawsuit.  Second, to the extent that he testified that the Sam's accident caused or contributed to Costa's death, such evidence was inadmissible because no wrongful death claim was brought.

Defendant's Rule 59 argument inexplicably focuses on the second statement, while ignoring the first.  In particular, Sam's balks that the Court contradicted itself by allowing Dr. Dowd to testify as follows: "I believe that it's likely that had he not had that injury and that setback that he would not have deteriorated as quickly as he did." (Doc. 107, at 101.)  That testimony plainly and directly bears on the relationship between Costa's deteriorating health and the Sam's injury.  As such, this opinion was properly admissible under the clear terms of the

---

[19]     Defendant's motion in limine sought to prevent plaintiff from presenting evidence that Costa's death "was caused by, the result of, or was [in] any way contributed to by Mr. Costa's incident as Sam's." (Doc. 66, at 1.)  The August 6 Order granted the motion, but did so by adopting the principle that plaintiff could not present evidence that Costa's death was caused or contributed to by the Sam's incident.  The August 6 Order did not declare specific statements or opinions of Dr. O'Dowd to be inadmissible, but simply set forth the legal principles that would govern whether those specific statements or opinions were or were not admissible.  Two days later, on August 8, 2012, the undersigned entered another Order (doc. 86) implementing and applying the principles announced in the August 6 Order to the specific portions of Dr. O'Dowd's testimony to which objection was taken.  Contrary to defendant's current position, the two written orders worked hand in hand, with the earlier setting forth the governing rules and the later applying them.  There is no contradiction whatsoever between the two.

August 6 Order, as being relevant to the question of personal injury damages (pain and suffering, mental anguish, aggravation of pre-existing condition).  Defendant's contention to the contrary flirts with frivolity.

>    2.    *Cumulative Effects of Dr. O'Dowd's Testimony.*

Defendant also maintains that a new trial is warranted because Dr. O'Dowd's testimony had the cumulative effect of "present[ing] to the jury the theme that the Sam's incident … caused his death." (Doc. 109-1, at 27.)[20]  Again, <u>none</u> of this evidence was admitted for the purpose of showing that Sam's caused or contributed to Costa's death.  Rather, it was admitted for the purpose of establishing the fact of and the causal connection between the Sam's accident and Costa's pain and suffering, aggravation of pre-existing condition, and so on in the remaining years of his life.[21]  Evidence may be relevant and admissible for one purpose, but not for another. If Sam's were worried at trial that the jury might consider this evidence for the improper purpose outlined in its Rule 59 Motion (*i.e.*, as evidence that "Sam's brought about his untimely and early demise" (doc. 109-1, at 28)), it could and should have requested a limiting instruction under the Federal Rules of Evidence.  *See* Rule 105, Fed.R.Evid. ("If the court admits evidence that is

---

[20]    Astonishingly, defendant suggests that the cumulative effect of this testimony was exacerbated by the Court's instruction to the jury allowing the award of damages "for the aggravation of any injury or condition." (Doc. 109-1, at 28 n.11.)  Defendant theorizes that this charge was improper or "further complicated the issue" because it thinks the term "aggravation" could be read as including death.  Later in its brief, Sam's goes even further, arguing that the jury "obviously interpreted [the instruction] to mean aggravation causing death and awarded an element of damage not prescribed by law." (*Id.* at 32.)  Defendant's position fails.  In the first place, the language that Sam's now finds objectionable was drawn from *Alabama Pattern Jury Instructions* § 11.13, and is a correct statement of law.  In the second place, if Sam's did not like the "aggravation" charge, or felt that the term "aggravation" would somehow erroneously be construed by the jury as meaning "aggravation causing death," then defense counsel should have objected to it at the charge conference instead of saying "we're okay with everything that you've given us." (Doc. 108, at 212.)  The objection has been waived, and defendant must lie in the bed it has made.

[21]    The objected-to testimony clearly was relevant and admissible for this purpose. For example, Dr. O'Dowd opined that "he continued to struggle throughout the rest of his life," that "he deteriorated significantly subsequent to that injury," and that "he got knocked down to a lower spot and he got accelerated" in his decline as a result of the Sam's injury. (Doc. 109-1, at 28.)  This evidence goes to the relevant, admissible points that Costa's health declined after the Sam's accident, and that his treating physician believed the Sam's accident caused or contributed to that decline.

admissible against a party or for a purpose – but not against another party or for another purpose – the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly."). Sam's failure to do so then precludes it from being heard to complain now that the jury might have considered this evidence (which was obviously admissible for one purpose) for another purpose as to which it would not be admissible. *See, e.g., United States v. Smith*, 459 F.3d 1276, 1297 (11th Cir. 2006) (explaining that because Rule 105 provides for limiting instructions upon request, "[t]he failure to give a limiting instruction is error only when such an instruction is requested") (citation omitted); *Bezalel v. Innovative Operators, LLC*, 2009 WL 2972210, *3 (11th Cir. Sept. 18, 2009) ("the burden to request a limiting instruction rests with the party seeking such an instruction").[22]

### 3. Dr. O'Dowd's Testimony Concerning Hospitalizations.

To round out this category of grounds for seeking a new trial, defendant argues that the jury should not have been permitted to hear Dr. O'Dowd's testimony concerning four hospitalizations that Costa endured between the date of the accident and the date of his death. Primarily, defendant couches this argument in terms of relevance, summarizing its point as follows: "[T]he jury was left with testimony probative of no issue which was no doubt confusing and, as a result, unfairly prejudicial." (Doc. 109-1, at 31.)

Defendant is not entitled to post-trial relief on this ground for at least five distinct reasons. First, the challenged testimony was indeed relevant to plaintiff's damages. When asked about the causal nexus between these hospitalizations and the Sam's accident, Dr. O'Dowd allowed that "it becomes more difficult medically" to determine how related these

---

[22]     Any suggestion by defendant that this Court had a duty *sua sponte* to provide such a limiting instruction is contrary to law. Besides, the undersigned refrained from unilaterally giving a limiting instruction on this point out of concern that it would do more harm than good. Defendant was clear that it wished to prevent the jury from hearing anything more about Costa's death than was necessary. For example, before Dr. O'Dowd's video deposition was played, defense counsel argued at sidebar, "Our biggest concern is that they mention death …. That's seven mentions of death and deteriorating until his death. We think that's highly prejudicial." (Doc. 107, at 84.) A limiting instruction on this issue would have further underscored and emphasized the fact of Costa's death for the jury. Under the circumstances, the Court left this important strategy determination in the hands of defense counsel. Having made its choice not to seek a limiting instruction, however, defendant cannot now be heard to complain that it is entitled to a new trial because this relevant, admissible evidence might have been considered for a purpose other than that for which it was admitted.

hospitalizations were to the accident as more time passed after the accident, but that, "Kind of the way I look at it, though, is that he got knocked down to a lower spot and he got accelerated. So, he had a number of admissions subsequent to that." (Doc. 107, at 100-01.) Clarifying this opinion, Dr. O'Dowd testified, "I believe that it's likely that had he not had that injury and that setback that … he would not have had those hospitalizations over that time course. That's what I think." (*Id.* at 101.) Such evidence satisfies the low threshold of relevance as to the compensatory damages to which plaintiff was entitled for pain and suffering, and aggravation of pre-existing conditions. That testimony was properly allowed on this basis.

Second, defendant's objection to the phrase "partially related" is misplaced because Dr. O'Dowd never testified that the hospitalizations were "partially related" to the accident. That was a term used by plaintiff's counsel. Dr. O'Dowd did not adopt it with respect to the hospitalizations. To be sure, he did say, "I think they were partially necessary," in response to the question of whether the hospitalizations were "at least partially necessary as a result of the accident." (Doc. 107, at 105.) Taken in context and with the whole of his testimony, however, this lone remark does not render the entirety of Dr. O'Dowd's testimony as to the four hospitalizations confusing or inadmissible, particularly given his clearly stated opinion that Costa "would not have had those hospitalizations over that time course" but for the Sam's accident. Defendant cannot obtain a new trial by taking one line of a witness's testimony in isolation and ignoring the inconvenient remainder.

Third, to the extent that Sam's is complaining that the references to hospitalizations must have confused the jury because plaintiff's counsel never asked Dr. O'Dowd to elaborate on the reasons for those hospitalizations, the argument is disingenuous. Had defendant been worried about juror confusion concerning the reasons for the four hospitalizations, defense counsel had a full and fair opportunity to cross-examine Dr. O'Dowd on this topic to elicit those details. It chose not to do so. A party cannot claim unfair prejudice because of purported confusion resulting from a witness's failure to provide details that the party could have extracted from him on cross-examination at trial, but chose not to do so. If defendant wished to alleviate this confusion, its remedy was to ask the witness a question, not to sit idly by until an unfavorable verdict was returned and then demand relief under Rule 59 based on that purported confusion.

Fourth, by defendant's own admission, it did not object to this testimony on relevancy grounds before or during the trial. (Doc. 109-1, at 30.) Although defendant explains that the

relevancy objection did not come to fruition until plaintiff announced after Dr. O'Dowd's testimony was admitted that he was not seeking recovery for expenses related to these hospitalizations,[23] defendant could have requested a curative instruction at that time.  It did not. Principles of waiver discussed *supra* weigh heavily against granting post-trial relief on the strength of a relevancy objection that defendant is interposing <u>for the first time</u> in his Motion for New Trial.

Fifth, even if admission of this "four hospitalizations" testimony was erroneous, defendant is making a mountain out of a molehill.  This was an extremely minor evidentiary point that consumed a tiny fraction of Dr. O'Dowd's testimony.  To the best of the Court's recollection, these hospitalizations were never again mentioned to the jury during the trial, except <u>by defendant</u> in its closing argument.  (Doc. 108, at 238.)[24]  A movant does not get a new trial every time an evidentiary error is made on a minor point.  *See Jennings v. Thompson*, 813 F. Supp.2d 29, 32 (D.D.C. 2011) ("[T]he standard for granting a new trial is not whether minor evidentiary errors were made.") (citation omitted).  Rather, "a new trial is warranted only where the error has caused substantial prejudice to the affected party (or, stated somewhat differently, affected the party's 'substantial rights' or resulted in 'substantial injustice')."  *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004) (citations omitted); *see also U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1286 (11th Cir. 2001) ("An error on an evidentiary ruling will result in the reversal of a jury's verdict only if a party establishes a substantial prejudicial effect or a manifest injustice.").  Offhand, nonspecific references in Dr. O'Dowd's testimony to hospitalizations post-dating Costa's accident do not establish the sort of substantial prejudice or manifest injustice that might warrant the remedy of a new trial.

---

[23]     In particular, plaintiff's counsel announced shortly after Dr. O'Dowd's video deposition was played to the jury that "we do not intend to put on evidence of the amount of the medical bills or ask the jury to award an amount to reimburse Ms. Costa for the medical liens. … [A]ll the medical bills on my exhibit list I am not offering as evidence in the case in the aftermath of Dr. O'Dowd's deposition."  (Doc. 107, at 113.)

[24]     Ironically, even as defendant protests to the Court that the jury never should have heard about Costa's post-accident hospitalizations, it was defense counsel who raised them in closing argument, explaining to the jury that Costa was hospitalized in August 2011 to have fluid removed from his right knee, in support of defendant's overall argument that Costa was a frail, sickly man whose medical problems between March 2010 and March 2012 had nothing to do with Sam's dropping a television on him.

###### E.      Testimony Concerning Billings.

As its fifth category of assignments of error, defendant protests that "[d]uring Dr. O'Dowd's testimony, the jury heard countless references to billing but never saw a single bill or heard a single figure." (Doc. 109-1, at 31.)  Defendant contends that this evidence was so prejudicial that it is entitled to a new trial.

Dr. O'Dowd's testimony did include references to medical expenses, albeit a far cry from the "countless references" to which defendant refers.  In that testimony, plaintiff's counsel asked whether certain bills located in a file of medical records were from Dr. O'Dowd's office, and Dr. O'Dowd answered affirmatively. (*Id.* at 102.)  That was it.  Shortly after Dr. O'Dowd's testimony, plaintiff's counsel announced (outside the jury's presence) for the first time that he was no longer seeking any recovery for medical bills in this case and that he would offer no evidence of medical bills in the case. (Doc. 107, at 113.)  After that revelation, the jury never heard a word about the amount of those bills, or any testimony about the reasonableness or unreasonableness of those bills, and never saw or received any exhibits containing, documenting, or quantifying such expenses.  Those medical bills were never mentioned in closing arguments, except when defense counsel told the jury, "there is no claim in this case for medical expenses. You are not here or even to consider the expenses that the Costas may have or may not have incurred from the medical treatment that Mr. Costa received.  That's not what you are to consider." (Doc. 108, at 234.)  The jury received no instructions about medical bills or expenses, but was told that the compensatory damages claimed by plaintiff were solely for "Physical pain and mental anguish and aggravation of pre-existing condition." (*Id.* at 257.)

From these facts and circumstances, defendant argues that it is entitled to a new trial because "the jury was given speculative and irrelevant testimony and allowed to award damages for an abandoned element" and because "they were given evidence they did not need and did not know what to do with." (Doc. 109-1, at 31.)  This is nowhere near the showing of manifest injustice or substantial prejudice that might justify throwing out the jury's verdict and starting over.  The testimony in question was nothing more than Dr. O'Dowd's acknowledgment that his office had billed Costa for medical services provided.  Using common sense, the jury would have known that anyway.  The jury received no evidence and no information as to the amount, contents or reasonableness of the bills.  Plaintiff's counsel never asked them to award medical expenses as a component of damages.  The jury charge said nothing about medical expenses.

And defendant's counsel hammered the point home during his closing argument by highlighting that there was no claim for medical expenses in this case and that the jury was not to consider any medical expenses in formulating a damages award.  Given what transpired, the Court perceives the likelihood of juror confusion on this issue to be exactly nil.  Besides, if Sam's were worried about confusion, it could and should have requested a supplemental jury charge to explicitly inform the jury that it could not award damages for medical expenses.  Defense counsel having chosen not to do so, Sam's cannot now convert that failure to request a curative instruction into a new trial, even if by some infinitesimally small chance the jury might have been confused on this point.

> **F.      *Remittitur.***

Finally, in the alternative to its motions for judgment as a matter of law and for new trial, Sam's requests a remittitur of the jury's $200,000 verdict against it.  Defendant reasons that "the verdict does not reflect that degree of injury. … Clearly it is excessive."  (Doc. 109-1, at 32.) Defendant goes on to speculate as to all sorts of improper considerations that "obviously" factored into the jury's verdict, such as awarding damages for "aggravation causing death," awarding damages "for Mr. Costa's overall demise," and "speculatively awarding damages for what it deemed to be the costs associated with the medical care."  (*Id.*)

The standard for remittitur is not whether the losing party can invent outlandish scenarios that might have infected the jury's decision-making process.  That's not how remittitur works. Rather, the legal standard is whether the verdict actually awarded exceeds the amount established by the evidence.  *See Gowski v. Peake*, 682 F.3d 1299, 1310 n.10 (11th Cir. 2012) ("As a general rule, a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence.") (citation omitted).[25]  "When the jury's verdict is within the bounds of possible awards supported by the evidence, its award should not be disturbed."  *Carter v. DecisionOne Corp. Through C.T. Corp. System*, 122 F.3d 997, 1006 (11th Cir. 1997).

---

[25]      *See generally Quality Foods, Inc. v. U.S. Fire Ins. Co.*, 715 F.2d 539, 542 & n.2 (11th Cir. 1983) (explaining that, in a diversity case, the determination of whether a jury verdict is excessive is determined by reference to state substantive law, and that under Alabama law, "a jury verdict will not be set aside unless it is found to be so excessive as to demonstrate bias, passion, prejudice, corruption or other improper motive or cause").

Here's what the evidence of damages showed in this case:  Prior to the accident, Costa suffered from various long-term medical problems, but lived an active, basically healthy life.  He and his wife regularly traveled together, including trips out of state and overseas (including a lawn-bowling excursion to Florida just two months before the accident).  (Doc. 107, at 38, 80-81.)  He walked a mile each day, three days per week, and also enjoyed swimming and lawn bowling.  (*Id.* at 38-41.)  He was, by all accounts, "doing just fine."  (*Id.* at 40.)  Then came the Sam's accident.  Because of Sam's negligence in causing the television to fall on his leg, Costa sustained a large hematoma, endured excruciating pain, and received medical treatments (including surgery and a lengthy hospitalization) over a period of months.  (*Id.* at 57-63.)  Costa experienced pain and discomfort in his leg for "quite a long time" afterwards.  (*Id.* at 63.)  In fact, his left leg remained swollen and discolored from the Sam's accident some six months later.  (*Id.* at 70.)  Costa's lifestyle changed markedly for the worse after the accident, as he was no longer as active and "there was hardly anything" he and his wife could do.  (*Id.* at 71.)  His quality of life "went downhill" and "steadily declined" for the next two years.  (*Id.* at 72-73.)  Medically, his treating physician opined that Costa "developed acute renal failure associated with" the hematoma he received in the Sam's accident (*id.* at 90), that "[h]is functional level went down substantially" after the Sam's accident and he never "got back to the same level he was at before his accident" (*id.* at 90-91).  The physician further testified, "I'm completely confident that this caused him to be ill, or more ill than he was prior to the injury.  And I'm confident that my impression is that he never got back to his previous functional level."  (*Id.* at 92.)

In sum, what the evidence showed is that Costa was a physically active, stable retiree who exercised and traveled frequently before a Sam's employee knocked a television onto him; that Costa received a very painful leg injury requiring extensive medical treatment and a lengthy hospitalization; that Costa's leg was still injured some six months after the fact; that the Sam's accident reduced Costa's overall level of functioning, accelerated his deterioration, and caused him to be "knocked down to a lower spot" from which he never recovered; and that his quality of life deteriorated markedly during the two years after the accident, as a result of the accident, until the time of his death.

On this evidence, the $200,000 award of compensatory damages awarded by the jury for physical pain, mental anguish, and aggravation of a pre-existing condition was well within the

bounds of possible awards supported by such evidence.  Given the choice, the Court strongly suspects that most reasonable people would gladly surrender $200,000 in compensation to forego the sort of pain and suffering, mental anguish, and exacerbated medical conditions that Costa endured as a direct result of Sam's negligence.  Far from being excessive, the jury's verdict was well below the maximum possible award that the evidence could have permissibly supported. The Motion for Remittitur is **denied**.

IV.     **Conclusion.**

For all of the foregoing reasons, defendant's Motion for Judgment as a Matter of Law or in the Alternative, Motion for New Trial or in the Alternative, Motion for Remittitur (doc. 109) is **denied** in its entirety.

DONE and ORDERED this 31st day of October, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE